JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
Kamal Kassim
Kimberly Kassim

**(b)** County of Residence of First Listed Plaintiff New London
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Lewis Chimes Law Office of Lewis Chimes LLC
45 Franklin Street
Stamford, CT 06901

**DEFENDANTS**
Walmart Stores, Inc., Walmart Stores East, LP, Kinderhook Industries II, L.P., Kinderhook Industries, L.L.C., Kinderhook Capital Fund II, L.P., Crestwood Holdings, Inc., Bergan, L.L.C., John Elmburg,

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
(Deft. Cont.) Robert Elmburg, Eric Elmburg, and Rocky Flick

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☒ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from Another District *(specify)* ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
28 USC 1332

Brief description of cause:
Products liability claim based upon defective gas cannister.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE DOCKET NUMBER

DATE 3/20/13 SIGNATURE OF ATTORNEY OF RECORD [signature]

**FOR OFFICE USE ONLY**

RECEIPT # AMOUNT APPLYING IFP JUDGE MAG. JUDGE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **KAMAL KASSIM, and KIMBERLY KASSIM,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**WALMART STORES, INC., WALMART WALMART STORES EAST, LP, KINDERHOOK INDUSTRIES II, L.P., KINDERHOOK INDUSTRIES, L.L.C. KINDERHOOK CAPITAL FUND II, L.P., CRESTWOOD HOLDINGS, INC., BEGAN, L.L.C., JOHN ELMBERG, ROBERT ELMBERG, ERIC ELMBERG, and ROCKY FLICK,**<br>**Defendants.** | : | **CIVIL ACTION NO.**<br><br>**<u>JURY DEMAND</u>** |

## <u>COMPLAINT</u>

COME NOW Plaintiffs, Kamal and Kimberly Kassim, and complain of Defendants Wal-Mart Stores, Inc., Wal-Mart Stores East, LP, Kinderhook Industries II, L.P., Kinderhook Capital Fund II, L.P., Kinderhook Industries, L.L.C., Crestwood Holdings, Inc., Defendant Bergan, L.L.C., John "Cy" Elmburg, Robert Elmburg, Eric Elmburg and Rocky Flick, as follows:

## <u>PARTIES</u>

1. Plaintiffs, Kamal and Kimberly Kassim ("Kassims"), are individuals who are citizens of the State of Connecticut. At all times mentioned herein, the plaintiffs resided in Ledyard, Connecticut.

2. Defendant Wal-Mart Stores, Inc. is a Delaware corporation, engaged in business in Connecticut and its principal place of business is located at 702 SW 8th Street, Bentonville, Arkansas 72716. Wal-Mart Stores, Inc. may be served with process through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

3. Defendant Wal-Mart Stores East, LP. is a Delaware corporation, engaged in business in Connecticut and its principal place of business is located at 702 SW 8th Street, Bentonville, Arkansas 72716. Wal-Mart Stores, Inc. may be served with process through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

4. Defendant Kinderhook Industries II, L.P. is a Delaware limited partnership, engaged in business in Connecticut and/or with substantial contacts with Connecticut subjecting it to "long arm" personal jurisdiction and its principal place of business is located at 521 Fifth Avenue, 34th Floor, New York, NY 10175. Defendant Kinderhook Industries II, L.P. may be served with process through its registered agent, Corporation Service Company, 2711 Centerville Road, Ste. 400 Wilmington, DE 19808.

5. Defendant Kinderhook Capital Fund II, L.P. is a Delaware limited partnership, engaged in business in Connecticut and/or with substantial contacts with Connecticut subjecting it to "long arm" personal jurisdiction and its principal place of business is located at 521 Fifth Avenue, 34th Floor, New York, NY 10175. Defendant Kinderhook Capital Fund II, L.P. may be served with process through its registered agent Corporation Service Company, 2711 Centerville Road, Ste. 400, Wilmington, DE 19808.

6. Defendant Kinderhook Industries, L.L.C. is a Delaware limited liability corporation, engaged in

business in Connecticut and/or with substantial contacts with Connecticut subjecting it to "long arm" personal jurisdiction and its principal place of business is located at 521 Fifth Avenue, 34th Floor, New York, NY 10175. Defendant Kinderhook Industries, L.L.C. may be served with process through its registered agent, Corporation Service Company, 2711 Centerville Road, Ste. 400, Wilmington, DE 19808.

7. Defendant Crestwood Holdings, Inc. is an Oklahoma corporation, engaged in business in Connecticut and/or with substantial contacts with Connecticut subjecting it to "long arm" personal jurisdiction and its principal place of business is located at 2505 NW Industrial Parkway, Miami, OK 74354. Defendant Crestwood Holdings, Inc. may be served with process through its registered agent, Robert Elmburg, 2505 NW Industrial Parkway, Miami, OK 74354.

8. Defendant Bergan, L.L.C. is an Oklahoma limited liability partnership, engaged in business in Connecticut and/or with substantial contacts with Connecticut subjecting it to "long arm" personal jurisdiction and its principal place of business is located at 27600 S Hwy 125, Monkey Island, OK 74331. Defendant Bergan, L.L.C. may be served with process through its registered agent, Eric Elmburg, 27600 S Hwy 125, Monkey Island, OK 74331.

9. Defendant John "Cy" Elmburg is an individual who resides in Oklahoma and may be served with process at his address: 27600 S. Highway 125, Afton, OK 74331. Defendant John "Cy" Elmburg engaged in business in Connecticut and/or has substantial contacts with Connecticut subjecting him to "long arm" personal jurisdiction.

10. Defendant Robert Elmburg is an individual who resides in Oklahoma and may be served with process at his address: 3025 S. Birmingham Place, Tulsa, OK 74008. Defendant Robert Elmburg engaged in business in Connecticut and/or has substantial contacts with Connecticut

subjecting him to "long arm" personal jurisdiction.11. Defendant Eric Elmburg is an individual who resides in Oklahoma and may be served with process at his address: 55115 E. 260 Road, Afton, OK 74331. Defendant Eric Elmburg engaged in business in Connecticut and/or has substantial contacts with Connecticut subjecting him to "long arm" personal jurisdiction.

11. Defendant Rocky Flick is an individual who resides in Oklahoma and may be served with process at his address: 13533 S. 500 Road, Blue Jacket, OK 74333. Defendant Rocky Flick engaged in business in Connecticut and/or has substantial contacts with Connecticut subjecting him to "long arm" personal jurisdiction.

**JURISDICTION AND VENUE**

12. This Court has jurisdiction over this lawsuit under 28 U.S.C. § 1332 because diversity of citizenship exists between Plaintiffs and Defendants. Plaintiffs are citizens of the State of Connecticut, and Defendants are foreign individuals and businesses that maintain their residences and principal places of business outside of the State of Connecticut.

13. The amount in controversy exceeds, exclusive of interest and costs, the sum of Seventy-Five Thousand and No/100 Dollars ($75,000.00).

14. This Court also has jurisdiction over this lawsuit because Plaintiffs assert claims for damages under the United States Consumer Product Safety Act, 15 U.S.C. § 2072.

15. This Court has jurisdiction over Defendants because they have purposefully availed themselves of the privilege of conducting activities in the State of Connecticut and, by placing their portable gasoline containers, including the subject container, into the stream of commerce, and have engaged in other activities with the purpose and intent of defrauding Plaintiffs and countless other Connecticut citizens like Plaintiffs, have established continuous and systematic contacts sufficient to confer personal

jurisdiction.

16. Jurisdiction over Defendants will not offend traditional notions of fair play and substantial justice and is consistent with the constitutional requirements of due process.

17. Venue in this district is proper under 28 U.S.C. § 1391(a)(2) because a substantial part of the events and/or omissions giving rise to this claim occurred in Ledyard, which is within the jurisdiction of the United States District Court for the District of Connecticut.

## FACTS AND GENERAL ALLEGATIONS

### The Gasoline Container and Explosion which Burned Kamal ad Kimberly

18. On March 25, 2010, Kamal Kassim was using a plastic Blitz gas container near a backyard fire pit in Ledyard, Connecticut when flames from the fire in the fire pit ignited gasoline vapors outside of the remote gas container and flashed into the gas container.

19. Without warning, the Blitz gas container exploded, prompting 911 calls from more than a mile away, where the explosion could be heard.

20. As a result of the explosion, Kamal Kassim's body was covered with flaming gasoline which melted his pants to his legs and severely burned the entire front of his body, including his face and hands. He rolled on the ground, trying unsuccessfully to extinguish the flames.

21. Kamal Kassim's wife, Kimberly Kassim, used her jacket to smother the flames and sustained burn injuries also.

22. Kamal was immediately transported by Life Star to the Bridgeport Hospital burn unit in Bridgeport, Connecticut where he underwent numerous surgeries, procedures, and treatments, which were excruciatingly painful. Two months later, he was released and his care transferred to

the outpatient burn unit, here he received twelve months of additional treatment while receiving additional cared from the Visiting Nurse Associates (VNA) of Southeastern Norwich/New London CT's care. Since that time, Kamal has continued to undergo excruciatingly painful surgical procedures and rehabilitation for the burn injuries he suffered.

23. After the incident, Kimberly Kassim was transported to William W. Backus Hospital where she underwent treatment for her burn injuries.

24. As a result of the explosion and the ensuing fire, Kamal Kassim suffered catastrophic third-degree burns over a substantial portion of his body which left him permanently scarred and disfigured. Kimberly Kassim suffered burn injuries to her hands, which left her scarred and disfigured.

25. Plaintiff Kamal Kassim purchased the subject gasoline container at a Wal-Mart's store located at 150 Gold star Highway, Groton, CT.

26. The subject gas can was not designed with a flame arrestor which is a simple device that prevents flashback explosions of gasoline cans exactly like the one which injured Plaintiffs in this lawsuit.

27. At the time it exploded, the container was not modified or altered after it left Defendants' control, and the container was being used in an ordinary and foreseeable manner.

**Wal-Mart's Roles as Seller and Designer of the Gas Can**

28. Wal-Mart Stores, Inc. and Wal-Mart Stores, LP (hereinafter referred to collectively as "Wal-Mart") is the largest retailer of portable plastic gasoline containers in the United States.

29. Wal-Mart controlled approximately 25% of the gas can market in the United States during all relevant periods of time.

30. Wal-Mart's policy of "every day low price" was dependent on a policy of "every day low cost" which lead Wal-Mart to adopt a policy of tight control over its suppliers, including Blitz U.S.A., which extended to the design of their products.

31. The subject gasoline container which caused the personal injuries giving rise to this action is a Blitz five-gallon container and was manufactured by Blitz U.S.A., Inc. ("Blitz"), an insolvent Oklahoma corporation currently in Chapter 11 liquidation in Delaware.

32. During the relevant time period, Wal-Mart actually became the designer of Blitz's gas cans, having the power to dictate and actually using that power to dictate when a design change would be made, setting forth the schedule for the change, requiring monthly reports regarding design work, reviewing design prototype and actually determining when the newly designed product was ready to go to market.

33. In addition to selling the subject gas can, Wal-Mart controlled the design of Blitz gas cans, including the gas can that injured plaintiffs, which was sold not only in Wal-Mart's stores but all gas cans sold by Blitz to retailers of Blitz gas cans.

**The Defendants Elmburgs' and Flick's Actions to Get The Money Out of Blitz U.S.A., Inc.**

34. Blitz was directly owned by John "Cy" Elmburg, Robert Elmburg, and Eric Elmburg ("Elmburgs") until approximately 2006 when the Elmburgs formed Defendant Crestwood Holdings, Inc. ("Crestwood") to hold their Blitz assets. The Elmburgs have owned Crestwood Holdings, Inc. at all relevant times.

35. In the 2004/2005 time frame, Blitz was sued in a growing number of lawsuits for designing, manufacturing and selling gas cans that lacked safety devices, known as flame arrestors, to prevent flashback explosions. In these cases, Blitz gas cans had exploded and severely burned and killed

multiple consumers, the majority of which were children.

36. As a result, Blitz's owners, the Elmburgs, and Blitz's President and CEO, Rocky Flick, retained a management consulting firm to advise them on how to deal with the "litigation problem."

37. The business strategy proposed and adopted by the Defendants Elmburgs and Flick included the strategy of "get the money out before the liability goes up" and "equity reduction."

38. Rocky Flick admitted under oath that the purpose behind this strategy was to drain the company of its assets so that if a burned consumer received a large jury award, there would be no assets for that person, in this case the Kassims, to recover.

39. A recently discovered letter shows that in 2006 Blitz knew that it was headed for bankruptcy court as a result of the product liability lawsuits. Blitz's CEO, Defendant Cy Elmburg wrote a 2006 letter to Wal-Mart's CEO Lee Scott pleading for Wal-Mart's assistance to prevent that from occurring.

40. At one time, Blitz had flame arrestors on its metal gas cans but when it began making plastic cans, it removed the arrestors from the design, leaving consumers vulnerable to the risk of explosion.

41. Since the early 1990s, lawsuits against Blitz have involved claims for hundreds of millions of dollars of medical bills, claims for excruciating pain and suffering, vocational loss, psychiatric impact and permanent disfigurement.

42. Despite this fact, Blitz's owners and executives retained relatively modest amounts of insurance leaving it grossly underinsured.

43. Blitz U.S.A. is now in bankruptcy, leaving Kamal and Kimberly exactly as the Elmburgs and Flick intended, without assets to recover from Blitz.

44. To execute the strategy of getting the money out before the liability went up, the Elmburgs and Flick divided assets owned by Blitz U.S.A. between Blitz and Defendant Bergan, L.L.C. ("Bergan") to

transfer all of Blitz's non-gas can assets into Bergan to shield them from product liability in Blitz gas can lawsuits. Crestwood was formed to hold the stock. Flick also was given an ownership interest for his participation and complicity. The sole purpose of these transactions was to leave plaintiffs, including the Kassims, uncompensated for their severe burn injuries.

45. The Elmburgs, Flick, and Crestwood then set out to sell Blitz U.S.A. and pocket millions of dollars in proceeds before those who were injured could obtain the assets.

46. The Elmburgs, Flick and Crestwood diverted assets from Blitz for their own personal gain to prevent, hinder and defraud Plaintiffs and others like them who had been severely injured by Blitz gas cans. The Elmburgs and Flick managed Crestwood and Blitz in a manner that their separate corporate identities no longer existed.

47. A great injustice would be forced upon Kamal and Kimberly if the Court were not to recognize the legal fiction of corporate separateness.

48. Through a series of transactions with related corporations, on or about September 19, 2007, Blitz USA was sold by Crestwood to a New York venture capital firm known as Kinderhook Industries, LLC. The Elmburgs, Flick and Crestwood pocketed millions of dollars that otherwise would have gone to those who were injured by their exploding gas cans.

49. On September 2, 2007, a Press Release was made announcing Kinderhook Industries, L.L.C.'s purchase of Blitz U.S.A., Inc. which stated in part as follows:

> Blitz USA one of the nation's premiere product manufactures, has signed an agreement to sell the company to an investment group which includes Blitz's current President Rocky Flick and Kinderhook Industries, LLC, a New York-based private equity firm. The announcement was made by Blitz owner John R. "Cy" Elmburg. Elmburg, who will retire following completion of the sale, said several members of the current management team at Blitz USA, including Rocky Flick have also acquired equity positions in the company in the transaction. Flick will become CEO following the close of the transaction, which is expected to be

> completed in the coming week. Elmburg's two sons will also be selling their company equity at this time. The Pet Division of Blitz USA, which is now Bergan L.L.C. will not be a part of the transaction.

**Kinderhook's Draining of Blitz's Assets Through Related Transactions**

50. As a result of complicated transactions which were all part of Kinderhook's purchase in 2007, Kinderhook Capital Fund II, L.P. finally ended up with the stock of Blitz through various corporate transactions by and through Kinderhook entities including Kinderhook Industries, L.L.C. and Kinderhook Industries II, L.P. (The three Kinderhook Defendants shall be referred to as "Kinderhook").

51. Upon completion of the sale, Kinderhook restructured the ownership of Blitz U.S.A. into a series of interdependent subsidiary holding companies comprised of a series of Delaware limited liability companies and corporations. In the end, Kinderhook Capital Fund II, L.P. gained ownership of Blitz Holdings, LLC which owned Blitz Acquisition Holdings, Inc., which owned Blitz Acquisitions, LLC which owned Blitz U.S.A., Inc. and Blitz RE Holdings, LLC.

52. As part of this restructuring, Kinderhook saddled Blitz with extraordinary amounts of debt, investing very little if any of its own equity in the company. The once vibrant business was now more inadequately capitalized and grossly underinsured with a Board controlled by Kinderhook directors.

53. Through these transaction, Kinderhook set up a maze of corporations in a single minded attempt to insulate Blitz's assets from those individuals that the Defendants knew Blitz's gas cans already had and would continue to injure, including the Kassims.

54. Kinderhook engaged in a series of transactions to drain Blitz's assets which were not conducted at arm's length.

55. Kinderhook had Blitz pay hundreds of thousands of dollars in management fees to Kinderhook Industries II, LP whose ultimate parent was Kinderhook Industries, Inc. The amount paid in

management fees to the related entity was grossly disproportional to the amount paid to the on-site managers of Blitz USA.

56. In November of 2010, Blitz's gas can designed without a flame arrestor was found to be defective in a product liability suit in Federal Court in Utah where the jury returned a verdict for six million dollars in the death of a toddler who was severely burned in an explosion. That judgment has never been paid.

57. Kinderhook immediately renegotiated Blitz's debt, increasing the burden on Blitz and placing Blitz in an even more precarious financial situation.

58. In February of 2011, Blitz transferred millions of dollars to Blitz Acquisitions Holdings, Inc. in yet another attempt to get assets out of Blitz. Blitz Acquisitions Holdings then purchased Reliance, a Canadian blow molding company, with the millions of dollars belonging to Blitz. This acquisition allowed Kinderhook to claim in Blitz's bankruptcy that Kinderhook was entitled to the proceeds of any sale of Reliance instead of those who had been burned and left without adequate assets to compensate them for their injuries. The sole purpose of this transaction was to benefit Kinderhook and harm the Plaintiffs in this lawsuit and others like them who have been injured by Blitz' products.

59. In November of 2012, Blitz filed for Chapter 11 bankruptcy protection through which it sold off substantially all of its few remaining assets, all of which had been borrowed against by the Defendants and were subject to bank liens, in August of 2012.

60. Kinderhook's management of Blitz was conducted with the sole purpose of draining money from Blitz USA and those who had been injured by their products to related corporate entities. These entities should not be recognized as separate legal entities given that their separateness did not exist. A great injustice would be bestowed upon the Plaintiffs if legal separateness were to be recognized

between the Kinderhook entities and Blitz.

**Plaintiffs' Injuries**

61. As a result of their injuries, Plaintiffs have incurred several million dollars in medical and related expenses. Kamal Kassim continues to require additional medical care including surgical procedures which will result in even higher medical bills. He has also suffered extreme physical and emotional pain and suffering and psychological injuries which will require care and treatment as well. He has suffered severe, permanent disfigurement. He has also suffered lost earnings and lost earning capacity and impairment of his ability to enjoy life activities.

62. Kamal Kassim's injuries are permanent and his ability to perform ordinary activities and enjoy life and his ability to earn a living have been permanently and adversely affected. She has suffered lost earnings and lost earning capacity and has and will continue to incur medical expenses.

**<u>FIRST CAUSE OF ACTION</u>**
**VIOLATION OF CONNECTICUT PRODUCT LIABILITY STATUTE**
**– Conn. Gen. Stat. §52-572m *et seq.***
**Defendants Wal-Mart Stores, Inc. and Wal-Mart Stores East, L.P.**

Plaintiffs re-allege and incorporate in this count each and every preceding allegation as if fully pled herein.

63. The Blitz subject gasoline container that caused the Kassims' injuries was defectively designed.

63. Wal-Mart sold the subject defective gasoline container that caused the Kassims' injuries. Wal-Mart is a "product seller" as that term is defined under Conn. Gen. Stat. §52-572m(a).

64. Wal-Mart engaged in the business of designing portable gasoline containers with Blitz U.S.A., including the gasoline container in the present case, which Wal-Mart knew was manufactured and sold to consumers within the stream of commerce. Wal-Mart is a

"manufacturer" as that term is defined under Conn. Gen. Stat. §52-572m(e).

65. Wal-Mart expected the subject gasoline container, which Wal-Mart introduced into the stream of commerce, to ultimately reach consumers and/or users without substantial change in the condition in which it was originally designed, manufactured and sold.

66. Similarly, Wal-Mart knew the subject gasoline container would be used by those consumers and/or users without inspection for defects.

67. The subject gasoline container did in fact reach the consumer and/or user without substantial change in the condition in which it was originally designed, manufactured and sold and unexpectedly exploded under ordinary and foreseeable use.

68. At all times complained of, a safer alternative design was available that would have eliminated the risk of such an explosion without substantially impairing the usefulness and intended purpose of the product.

69. The subject gasoline container was defective in that its design did not incorporate a flame arrester, an essential safety device that would have prevented the explosion that occurred in the present case.

70. A flame arrester, sometimes called a flash arrester or spark arrester, is a small metal device that is placed in a container's openings and allows liquids to flow out of the container but prevents the flashback of flames back into the container. The device consists of either a perforated metal disc or a woven wire mesh screen.

71. The efficacy of flame arresters has been known to the manufacturing industry, particularly to the manufacturers of portable gasoline containers, since at least the early 1970's. Flame arresters were first placed in industrial gasoline containers in the 1950's and in

consumer gasoline containers by 1978.

72. For more than a quarter century, the utility and efficacy of flame arresters in the context of consumer gasoline containers has been a topic of discussion in the media and national publications and the subject of numerous lawsuits filed by consumers, users, and bystanders that have been burned and/or killed in encounters with portable gasoline containers that were not equipped with the device.

73. Wal-Mart has been sued in dozens of gas can explosion lawsuits going back to at least 1995. The allegations of those lawsuits have included claims that the gas cans exploded and plaintiffs were severely burned and died because the gas cans sold by Wal-Mart were not equipped with flame arrestors.

74. Consequently, Wal-Mart and the other Defendants have known, or should have known, for decades prior to this incident that gasoline containers without flame arresters are susceptible to flashback (i.e., when gasoline vapors outside the container ignite, the flames can follow the vapor trail back inside the container causing it to explode and/or spew flames and burning gasoline), which poses a substantial danger to consumers and/or users of the product.

75. Nevertheless, despite the wealth of available scientific knowledge, Wal-Mart and the other Defendants have made, and continue to make, a conscious decision to endanger the safety of consumers, users, and bystanders by refusing to incorporate this simple, well-known safety device into their portable gasoline containers, even when it is apparent within the industry that the small, metal devices are both economically and technologically feasible.

76. The use of the portable gasoline container in the present case was, or should have been, reasonably foreseeable to Wal-Mart and the other Defendants.

77. Without a flame arrester, the portable gasoline container did not perform as safely as an ordinary consumer would expect when used in a reasonably foreseeable manner such as that in the present case.

78. Without a flame arrester, the foreseeable risk of injury and/or death associated with the use of the portable gasoline container far exceeded any utility and/or benefits associated with its design.

79. Further, the portable gasoline container was defective in that Wal-Mart failed to provide adequate warnings of the potential dangers associated with the uses and misuses of the gas can as designed without a flame arrester, specifically the potential for flashback and for explosion of the gas can, which would not be apparent to the ordinary consumer and/or user.

80. At all relevant times, consumers, bystanders, and/or foreseeable users, such as Kamal Kassim, were not, and still are not, likely to possess knowledge of the extent and magnitude of the risks associated with using these portable gasoline containers as designed, nor could they possibly appreciate the severity of injuries that are likely to occur.

81. Without such knowledge, consumers, bystanders, and/or foreseeable users, such as Plaintiffs, would not be in a position to avoid the product's inherent dangers through the exercise of ordinary and reasonable care. Conversely, Wal-Mart and the other Defendants knew, and were certainly in the best position to know, that the subject gasoline container in this lawsuit, as designed, posed a tremendous risk of severe injury and death to consumers, users, and bystanders.

82. Wal-Mart's acts and/or omissions in the design of the defective portable gasoline

container were the proximate cause and/or substantial factor in causing the Kassims' injuries.

83. Wal-Mart had knowledge of the design defects alleged herein at the time of its design and of the subject gas can and acted with complete indifference to and conscious disregard for the safety of Plaintiffs and other foreseeable plaintiffs, and therefore an award of punitive damages is appropriate.

84. Defendant Wal-Mart owed consumers, bystanders, and/or foreseeable users, including Plaintiffs, the duty of care of a reasonably prudent manufacturer in the design of their portable gasoline containers.

85. Defendant Wal-Mart ignored and/or breached their duty of care by its following negligent acts and/or omissions:

A. Failed to design a reasonably safe portable gasoline container;

B. Designed a portable gasoline container that was defective;

C. Placed into the stream of commerce a portable gasoline container that was defective in design;

D. Placed into the stream of commerce a portable gasoline container that was defective in that it failed to contain adequate warnings and instructions;

E. Placed into the stream of commerce a portable gasoline container that was unfit for its foreseeable and intended uses;

F. Placed into the stream of commerce a portable gasoline container likely to cause injury under ordinary and foreseeable use;

G. Failed to guard against flashback in the product design;

H. Failed to incorporate a flame arrester in the product design;

I. Failed to incorporate explosion proofing material in the product design;

J. Failed to incorporate an explosion suppression system in the product design;

K. Failed to inspect for defects in the product design;

L. Failed to guard against the product's hidden or latent defects;

M. Failed to properly test its portable gasoline containers and prototypes thereof with flame arresters and/or explosion suppression materials;

N. Failed to properly inspect and/or test its portable gasoline containers for susceptibility to flashback explosions;

O. Failed to provide adequate instructions and/or warnings with the product after learning, knowing, or having reason to know, of the defects existing in the product that rendered it unreasonably dangerous when used in a reasonably foreseeable manner;

P. Failed to provide adequate instructions and/or warnings with the product after learning, knowing, or having reason to know that consumers and/or users of the product would not realize the potential dangers associated with ordinary and foreseeable use ;

Q. Failed to provide adequate instructions and/or warnings with the product after learning, knowing, or having reason to know that a reasonable manufacturer would have warned of the potential dangers associated with ordinary and foreseeable use under same or similar circumstances;

R. Failed to adequately warn consumers and/or users of the product of the inherent dangers associated with use of its portable gasoline containers;

S. Failed to actively seek information regarding incidents in which consumers, users, and bystanders were injured and/or killed when they encountered such portable gasoline containers;

T. Failed to actively seek information regarding incidents involving explosion and/or internal combustion of portable gasoline containers;

U. Failed to protect foreseeable users of the portable gasoline containers from the dangers present in the use of their containers that it knew or should have known existed;

V. Failed to give adequate notice to consumers and users of the concealed danger, namely that if gasoline vapors outside the container are ignited, the ensuing flames can flashback inside the container and cause an internal combustion and explosion of the gas container;

W. Failed to provide post-sale warnings after learning, knowing, or having reason to know of the defects existing in the product that rendered it unreasonably dangerous for its intended use;

X. Failed to take subsequent remedial measures to recall or retrofit the product after learning, knowing, or having reason to know of the defects existing in the product that rendered it unreasonably dangerous for its intended and foreseeable uses;

Y. Failed to take subsequent remedial measures to recall or retrofit the product after learning, knowing, or having reason to know that a reasonable manufacturer would have recalled or retrofitted the product under same or similar circumstances;

Z. Ignored or failed to investigate complaints about the defects existing in the product that rendered it unreasonably dangerous for its intended use;

AA. Ignored or failed to investigate scientific, technological, and industry information and studies regarding the efficacy of flame arresters and/or explosion suppression materials;

BB. Ignored or failed to investigate media reports and national publications relating to the dangers and risks involved with the use of portable gasoline containers that do not contain flame arresters;

CC. Ignored and/or failed to investigate other lawsuits involving similar claims and incidents in which consumers, users, and/or bystanders were severely burned and/or killed when encountering such portable gasoline containers;

DD. Ignored and/or failed to investigate similar incidents involving portable gasoline containers; and/or

EE. Failed to report incidents and lawsuits involving consumers, users, and bystanders, who have been burned and/or killed when encountering the portable gasoline containers to the Consumer Product Safety Commission.

86. As an actual and proximate result of Wal-Mart's negligent acts and/or omissions, the portable gasoline container that caused Plaintiffs' injuries was placed into the stream of commerce in a defective and unreasonably dangerous condition.

87. As an actual and proximate result of Wal-Mart's negligent acts and/or omissions, Plaintiffs were subjected to the occurrence which makes the basis of this suit and have suffered the resulting injuries and damages described herein.

88. Kamal's and Kimberly's injuries and the manner in which they occurred were reasonably foreseeable to Wal-Mart and the other Defendants who had actual and/or constructive knowledge,

from within the industry, national publications, and prior lawsuits, that consumers, users, and bystanders were being routinely burned and/or killed when encountering their portable gasoline containers.

89. Wal-Mart's acts and/or omissions in the design, manufacture, assembly, marketing, distribution, and sale of the defective portable gasoline container were the proximate cause and/or substantial factor in causing Kamal's and Kimberly's injuries.

90. Wal-Mart had knowledge of the design defects alleged herein at the time of its design and of the subject gas can and acted with complete indifference to and conscious disregard for the safety of Plaintiffs and other foreseeable plaintiffs, and therefore an award of punitive damages is appropriate.

91. Defendant Wal-Mart, by and through its design of the portable gasoline container, expressly and impliedly warranted to the consumer and/or foreseeable users, such as Kamal and Kimberly, that the container was reasonably safe and fit for its ordinary and foreseeable purposes.

92. Wal-Mart knew, or should have known, that consumers and/or users, including the Kassims, intended to use the portable gasoline containers for ordinary and foreseeable purposes and that consumers and/or users, including the Kassims, were relying on Wal-Mart's skill and judgment in selling containers suitable for those purposes.

93. Kamal made ordinary and foreseeable use of the container in reliance on said warranties.

94. Contrary to said warranties, the portable gasoline container was defective and unfit for its ordinary and foreseeable purposes, rendering it unreasonably dangerous.

95. As an actual and proximate result of Defendants' breach of said warranties, the portable gasoline container was placed into the stream of commerce in a defective and unreasonably dangerous condition.

96. As an actual and proximate result of Wal-Mart's breach of said warranties, Plaintiffs suffered catastrophic burn injuries when the container unexpectedly and violently exploded.

97. Plaintiffs' injuries and the manner in which they occurred were reasonably foreseeable to Wal-Mart who had actual and/or constructive knowledge, from within the industry, national publications, and prior lawsuits, that consumers, users, and bystanders were being burned and/or killed when encountering their portable gasoline containers.

98. Wal-Mart breached its express and implied warranties by the failure of the gasoline container itself and by improper failure to warn of the risks associated with the use of its product and failure to provide instructions for safe operation.

100. Such representation was false and involved a material fact concerning the character or quality of the gasoline container in question.

101. Plaintiffs justifiably relied on such representation which constituted a proximate and producing cause of their injuries.

## SECOND CAUSE OF ACTION
## VIOLATIONS OF THE CONSUMER PRODUCT SAFETY ACT
## Defendants Wal-Mart Stores, Inc. and Wal-Mart Stores East, LP

Plaintiffs re-allege and incorporate in this count each and every preceding allegation as if fully pled herein.

102. Pursuant to § 23(a) of the Consumer Product Safety Act, 15 U.S.C. § 2072, Defendant Wal-Mart is liable for the following:

A. Failing to report a defective and potentially hazardous product to the Consumer Product Safety Commission as required by § 15(b) of the Act, 15 U.S.C. § 2064;

B. Failing to report information pertaining to settled or adjudicated lawsuits for death or grievous bodily injury to the Consumer Product Safety Commission as required by § 37 of the Act, 15 U.S.C.A. § 2084.

103. Wal-Mart's violations of the consumer product safety rules were done knowingly and/or willfully.

104. Wal-Mart's failures to report the prior claims and/or potential hazards associated with portable gasoline containers that it designed and that it sold was a proximate cause of Plaintiffs' injuries.

105. Defendant Wal-Mart's failure to report the prior claims and/or potential hazards associated with its portable gasoline containers as required by the Consumer Product Safety Act, 15 U.S.C. § 2064, 2084, constituted negligence per se.

106. As a user of a consumer product, Kamal was a member of the class of persons the statute was designed to protect and his injuries are of the type the statute was designed to prevent.

107. Because Defendant Wal-Mart failed to report the prior claims and/or potential hazards associated with its defective and unreasonably dangerous portable gasoline containers, it was foreseeable that a user of the product, such as Kamal Kassim, could be severely injured and/or killed when the container unexpectedly and violently exploded.

108. Defendant Wal-Mart's violations of the consumer product safety rules were done without excuse.

109. Defendant Wal-Mart's failure to report the prior claims and/or potential hazards

associated with portable gasoline containers that it designed and it sold was a proximate cause of the Kassims' injuries.

**THIRD CAUSE OF ACTION**
**VIOLATION OF CONNECTICUT PRODUCT LIABILITY STATUTE**
**– Conn. Gen. Stat. §52-572m *et seq.***
**PIERCING THE CORPORATE VIEL AND JOINT ENTERPRISE LIABILTY**
**Defendants Elmburgs, Flick, Bergan and Crestwood**

Plaintiffs reallege and incorporate in this count each and every preceding allegation as though fully pled herein.

110. The gasoline container that exploded and burned Plaintiffs was designed, manufactured and sold by Blitz, U.S.A., Inc. Blitz was a "manufacturer" under Conn. Gen. Stat. §52-572m(e) and a "product seller" under Conn. Gen. Stat. §52-572m(b)

111. Blitz was owned and operated by John "Cy" Elmburg, Robert Elmburg, and Eric Elmburg until approximately 2006 when Crestwood Holdings was established to own and hold the Elmburgs' Blitz assets.

112. In the 2004/2005 time frame, Blitz had been sued repeatedly in lawsuits for designing, manufacturing and selling gas cans that lacked safety devices, known as flame arrestors, to prevent explosion. In these cases, Blitz gas cans had exploded and severely burned and killed multiple consumers, the majority of which were children.

113. At all relevant times, the Elmburgs and Flick knew that Blitz gas cans were defectively designed and sold because they were not equipped with a flame arrestor.

114. As a result of the liability exposure due to a growing number of gas can lawsuits Defendants Elmburgs and Flick retained a management consulting firm to advise them on how to deal with the "litigation problem."

115. The business strategy proposed and adopted by the Defendants Elmburgs and Flick included the strategy of "get the money out before the liability goes up" and "equity reduction."

116. Rocky Flick admitted under oath that the purpose behind this strategy was to drain the company of its assets so that if a burned consumer received a large jury award, there would be no assets for that person, in this case the Kassims, to recover.

117. At one time, Blitz had flame arrestors on its metal gas cans but when it began making plastic cans, it removed the arrestors from the design, leaving consumers vulnerable to the risk of explosion.

118. Since the early 1990s, lawsuits against Blitz have involved claims for hundreds of millions of dollars of medical bills, claims for excruciating pain and suffering, vocational loss, psychiatric impact and permanent disfigurement.

119. Despite this fact, Blitz's owners and executives retained relatively modest amounts of insurance leaving it grossly underinsured.

120. Blitz is now in bankruptcy, leaving the Kassims exactly as the Elmburgs and Flick intended, without assets to recover from Blitz.

121. To execute the strategy of getting the money out before the liability went up, the Elmburgs and Flick divided Blitz's assets between Blitz and Defendant Bergan, L.L.C. ("Bergan") to transfer all of Blitz's non-gas can assets into Bergan to shield them from product liability for Blitz' gas can lawsuits. Crestwood Holdings, Inc. was formed to hold the stock. Flick was given an ownership interest for his participation and complicity. The sole purpose for these transactions was to leave plaintiffs, including the Kassims, uncompensated for their severe burn injuries.

122. The Elmburgs, Flick, and Crestwood then set out to sell Blitz, USA and pocket millions of dollars in proceeds before those who were injured could obtain the assets.

123. The Elmburgs, Flick and Crestwood diverted the assets of Blitz for their own personal gain with the purpose and intent of hindering, delaying and defrauding Plaintiffs and others like them who had been injured by their gas cans. The Elmburgs and Flick managed Crestwood and Blitz in a manner that its separate corporate identity no longer existed.

124. The Elmburgs, Flick, Crestwood, Blitz and Bergan disregarded corporate formalities in their actual operations and specifically sought to fraudulently avoid paying any lawful judgment obtained in cases where Blitz gas cans exploded leaving any entity grossly undercapitalized and under insured.

125. Through a series of transactions with related corporations, on or about September 19, 2007, Blitz USA was sold by Crestwood to a New York venture capital firm known as Kinderhook Industries, LLC. The Elmburgs, Flick and Crestwood pocketed millions of dollars that otherwise would have gone to those who were injured by their exploding gas cans.

126. On September 2, 2007, a Press Release was made announcing Kinderhook Industries, L.L.C.'s purchase of Blitz U.S.A., Inc. which stated in part as follows:

> Blitz USA one of the nation's premiere product manufactures, has signed an agreement to sell the company to an investment group which includes Blitz's current President Rocky Flick and Kinderhook Industries, LLC, a New York-based private equity firm. The announcement was made by Blitz owner John R. "Cy" Elmburg. Elmburg, who will retire following completion of the sale, said several members of the current management team at Blitz USA, including Rocky Flick have also acquired equity positions in the company in the transaction. Flick will become CEO following the close of the transaction, which is expected to be completed in the coming week. Elmburg's two sons will also be selling their company equity at this time. The Pet Division of Blitz USA, which is now Bergan L.L.C. will not be a part of the transaction.

127. Each of these transfers, transactions and other actions of Defendants Elmburgs, Flick, Crestwood and Bergan were made with the actual intent to hinder, delay or defraud Plaintiffs and others like them and, therefore, an award of punitive damages is appropriate.

128. A great injustice would be forced upon Plaintiffs if the Court were not to recognize the legal fiction of corporate separateness.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF CONNECTICUT PRODUCT LIABILITY STATUTE**
**– Conn. Gen. Stat. §52-572m *et seq.***
**PIERCING THE CORPORATE VEIL**
**The Kinderhook Defendants**

Plaintiffs reallege and incorporate in this count each and every preceding allegation as though fully pled herein.

129. As a result of complicated transactions which were all part of Kinderhook's purchase in 2007, Kinderhook Capital Fund II, L.P. finally ended up with the stock of Blitz through various corporate transactions by and through Kinderhook entities including Kinderhook Industries, L.L.C. and Kinderhook Industries II, L.P. (The three Kinderhook Defendants shall be referred to as "Kinderhook").

130. Upon completion of the sale, Kinderhook restructured the ownership of Blitz USA into a series of interdependent subsidiary holding companies comprised of a series of Delaware limited liability companies and corporations. In the end, Kinderhook Capital Fund II, L.P. gained ownership of Blitz Holdings, LLC which owned Blitz Acquisition Holdings, Inc., which owned Blitz Acquisitions, LLC which owned Blitz U.S.A., Inc. and Blitz RE Holdings, LLC.

131. As part of this restructuring, Kinderhook saddled Blitz with extraordinary amounts of debt, investing very little if any of its own equity in the company. The once vibrant business was now even more inadequately capitalized and grossly underinsured with a Board controlled by Kinderhook directors.

132. Through these transaction, Kinderhook set up a maze of corporations in a single minded attempt to insulate Blitz's assets from those individuals that the Defendants knew Blitz's gas cans already had

and would continue to injure, including the Kassims.

133. Kinderhook then engaged in a series of transactions to drain Blitz's assets which were not conducted at arm's length.

134. Kinderhook had Blitz pay hundreds of thousands of dollars in management fees to Kinderhook Industries II, LP whose ultimate parent was Kinderhook Industries, Inc. The amount paid in management fees to the related entity was grossly disproportional to the amount paid to the on-site managers of Blitz.

135. In November of 2010, Blitz's gas container without a flame arrestor was found to be defective in a product liability suit in Federal Court in Utah where the jury returned a verdict for six million dollars in the death of a toddler severely burned in an explosion of the gas container.

136. Kinderhook immediately renegotiated Blitz's debt, increasing the burden on Blitz USA and placing Blitz in a situation where it was even more undercapitalized.

137. In February of 2011, Blitz transferred millions of dollars to Blitz Acquisitions Holdings, Inc. in yet another attempt to get assets out of Blitz. Blitz Acquisitions Holdings then purchased Reliance, a Canadian blow molding company, with the millions of dollars belonging to Blitz. This acquisition allowed Kinderhook to claim in Blitz's bankruptcy that Kinderhook was entitled to the proceeds of any sale of Reliance instead of those who had been burned and left without adequate assets to compensate them for their injuries. The sole purpose of this transaction was to benefit Kinderhook and harm the Plaintiffs in this lawsuit and others like them who had been injured by Blitz' products.

138. In November of 2012, Blitz filed for Chapter 11 bankruptcy protection through which it sold off substantially all of its few remaining assets in August of 2012. What remained of Blitz's had been borrowed against and were subject to bank liens taking precedence over unsecured claims of Plaintiffs

in the gas can litigation.

139. Kinderhook's management of Blitz was conducted with the sole purpose of draining money from Blitz USA and those who had been injured by their products to related corporate entities. These entities should not be recognized as separate legal entities given that their separateness did not exist. A great injustice would be bestowed upon the Plaintiffs if legal separateness were to be recognized between the Kinderhook entities and Blitz USA.

140. While fully informed of the valid and substantial product liability claims of injured Plaintiffs in gas can lawsuits, Kinderhook disregarded corporate formalities between Blitz and other subsidiary companies in their actual operation in the following ways:

a. By treating funds, assets and liabilities of one company as the funds, assets and liabilities of the other companies;

b. Blitz Holdings, LLC guaranteed the credit facility of its subsidiary companies;

c. Blitz Holdings, LLC made inter-company loans to three of its subsidiaries secured with assets of the remaining subsidiary.

d. Blitz Holdings LLC funneled funds back and forth between it and each of its subsidiaries to such an extent that they operated as a single treasury;

e. Blitz Holdings, LLC used this method of financing to deplete the assets of its subsidiary companies by means of a bargain sale;

f. Blitz Holdings, LLC and its subsidiary companies were located at the same address, employ the same employees and managers and used the same attorneys and accountants;

g. Blitz Holdings, LLC grossly undercapitalized and underinsured its subsidiary Blitz U.S.A., Inc. for its corporate undertaking as evidenced by its product liability and recent bankruptcy;

h. Diverted the assets of Blitz to one of its subsidiary companies for the express purpose of depriving existing and future Plaintiffs in product liability lawsuits, including Plaintiff, from recovering on lawful judgments;

i. Paid exorbitant management fees to a Kinderhook entity;

j. Failed to maintain arm's length relationships between its subsidiary companies; and

k. Blitz Holdings, LLC and its subsidiary companies have failed to maintain separate corporate records, accounting records and meeting minutes for each company.

141. Kinderhook formed Reliance Products Holdings, Inc. to fraudulently transfer monies from Blitz USA to Blitz Acquisition Holdings, Inc. in order to divert assets from Blitz, USA knowing that Blitz was insolvent. (On April 8, 2011, Kinderhook changed the name of Blitz Holdings LLC to LAM 2011 Holdings, LLC.)

142. Kinderhook has disregarded the corporate formalities of LAM 2011 Holdings in the same way it has the other Blitz entities. Kinderhook represented F3 Brands as being a wholly owned subsidiary of Blitz USA while in actuality distributing F3 Brands' shares to the individual shareholders of LAM 2011 Holdings.

143. Kinderhook created the described corporate structure and transactions to primarily avoid paying any lawful judgment obtained against the subsidiary manufacturer of the gas cans which were known to Kinderhook.

144. Kinderhook repeatedly used a sham of separateness afforded by the corporate form to fraudulently achieve shareholder limited liability.

145. Each of these transfers, transactions and the other conduct described was made with the actual intent to hinder, delay or defraud Plaintiffs and/or other creditors of Blitz and, therefore, an award of punitive damages is appropriate.

146. A great injustice would be forced upon Plaintiffs if the Court were not to recognize the legal fiction of corporate separateness.

**FIFTH CAUSE OF ACTION**
**FRAUDULENT CONVEYANCE(Common Law)**
**The Elmburgs, Flick, Bergan and Crestwood**

Plaintiffs reallege and incorporate in this count each and every preceding allegation as though fully pled herein.

147. The sale from the Elmburgs, Flick and Crestwood to Kinderhook of Blitz and its related entities constituted a fraudulent conveyance under Connecticut's Uniform Fraudulent Transfers Act.

148. The purpose and intent of the conveyance to Kinderhook was for the Elmburgs, Flick and Crestwood to avoid product liability and get their assets out before their liability went up and therefore, to delay and defraud those who had been injured and were rightfully entitled to the assets.

149. The Elmburgs profited by millions of dollars more than they had been offered just a year before in order to complete this fraud on those who had been burned by their defective gas cans.

150. Each of these transfers, transactions and the other conduct described was made with the actual intent to hinder, delay or defraud Plaintiffs and/or other creditors of Blitz and, therefore, an award of punitive damages is appropriate.

**SIXTH CAUSE OF ACTION**
**UNIFORM FRAUDULENT CONVEYANCE TRANSFER ACT**
**(Conn. Gen. Stat. §52-552 *et seq.*)**
**The Elmburgs, Flick, Bergan and Crestwood**

Plaintiffs reallege and incorporate in this count each and every preceding allegation as though fully pled herein.

151. The sale from the Elmburgs, Flick and Crestwood to Kinderhook of Blitz and its related entities constituted a fraudulent conveyance under Connecticut's Uniform Fraudulent Transfers Act.

152. The purpose and intent of the conveyance to Kinderhook was for the Elmburgs, Flick and Crestwood to avoid product liability and get their assets out before their liability went up and therefore,

to delay and defraud those who had been injured and were rightfully entitled to the assets.

153. The Elmburgs profited by millions of dollars more than they had been offered just a year before in order to complete this fraud on those who had been burned by their defective gas cans.

154. Each of these transfers, transactions and the other conduct described was made with the actual intent to hinder, delay or defraud Plaintiffs and/or other creditors of Blitz and, therefore, an award of punitive damages is appropriate.

**SEVENTH CAUSE OF ACTION**
**FRAUDULENT CONVEYANCE(Common Law)**
**The Kinderhook Defendants**

Plaintiffs reallege and incorporate in this count each and every preceding allegation as though fully pled herein.

155. Kinderhook's conveyances of monies belonging to Blitz to purchase Reliance, the payment of excessive management fees, and the transfers of F3 Brands constituted fraudulent conveyances by Kinderhook for the sole purpose of defrauding those who had been burned by Blitz defective gas cans.

156. Each of these transfers, transactions and the other conduct described was made with the actual intent to hinder, delay or defraud Plaintiffs and/or other creditors of Blitz and, therefore, an award of punitive damages is appropriate.

**EIGHTH CAUSE OF ACTION**
**UNIFORM FRAUDULENT CONVEYANCE TRANSFER ACT**
**(Conn. Gen. Stat. §52-552 *et seq.*)**
**The Kinderhook Defendants**

Plaintiffs reallege and incorporate in this count each and every preceding allegation as though fully pled herein.

157. Kinderhook's conveyances of monies belonging to Blitz to purchase Reliance, the payment of

excessive management fees, and the transfers of F3 Brands constituted fraudulent conveyances by Kinderhook for the sole purpose of defrauding those who had been burned by Blitz defective gas cans.

158. Each of these transfers, transactions and the other conduct described was made with the actual intent to hinder, delay or defraud Plaintiffs and/or other creditors of Blitz and, therefore, an award of punitive damages is appropriate.

**NINTH CAUSE OF ACTION**
**KIMBERLY KASSIM AS TO ALL DEFENDANTS – Loss of Consortium**

Plaintiffs reallege and incorporate in this count each and every preceding allegation as though fully pled herein.

158. As a result of the defendants actions, the Plaintiff Kimberly Kassim has been deprived of the has been deprived of the care, comfort, companionship and affection of her spouse, Kamal Kassim.

## DAMAGES

153. Defendants caused Kamal and Kimberly Kassim significant and permanent injuries and harm as a result of the negligence and other tortious conduct set forth herein. Plaintiffs demand money damages consistent with Connecticut law for the harm inflicted by Defendants, including, but not limited to the following:

a. Past and future costs of medical care;

b. Past and future loss of wages, entitlements, support and other recoverable economic losses;

c. Past and future emotional distress;

d. Past and future pain and suffering;

e. Past and future loss of consortium;

e. Past and future hedonic damages; and

f. Punitive damages.

## CLAIM FOR RELIEF

WHEREFORE, Plaintiffs Kamal and Kimberly Kassim pray that they be awarded all compensatory damages due and owed; that they be awarded punitive damages on any and all Counts on which punitive damages are recoverable; for their attorney's fees and costs associated with the prosecution of this action, as allowed by Connecticut law; equitable relief as permitted under the Connecticut Uniform Transfer Act and as otherwise allowed by law, and for such other and further relief as allowed by law.

**DEMAND FOR JURY TRIAL**

Kamal and Kimberly Kassim demand a jury trial.

By: _//s//*Lewis Chimes*_____________________
Lewis Chimes
Fed. Id: ct 07023
LAW OFFICE OF LEWIS CHIMES LLC
45 Franklin Street
Stamford, CT 06901
203-324-7744
Fax: 203-969-1319
chimeslaw@gmail.com

Diane M. Breneman
Stacey L. Dungan
Breneman Dungan, LLC
929 Walnut, Suite 800
Kansas City, MO 64106
Phone (816) 421-0114
Fax (816) 421-0112
E-mail: db@litigationkc.com
sd@litigationkc.com

Kenneth B. McClain
Humphrey, Farrington & McClain, PC
221 West Lexington Ave., Suite 400
Independence, MO 64050
Phone: 816-398-7435
Fax: 816-836-8966
E-mail: kbm@hfmlegal.com

ATTORNEYS FOR PLAINTIFFS
KAMAL AND KIMBERLY KASSIM